## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

KACEE SNIDER,

       Plaintiff,

v.

NOVAE LLC d/b/a BRIGHTSTAR CARE FORT COLLINS/LOVELAND, a Colorado Limited Liability Company;
CASSANDRA MOGEL, individually; and
JACOB YANES, individually,

       Defendants.

_____

### COMPLAINT AND JURY DEMAND
_____

Plaintiff Kacee Snider ("Plaintiff" or "Ms. Snider"), by and through counsel Felipe Bohnet-Gomez of RATHOD | MOHAMEDBHAI LLC, respectfully alleges for her Complaint and Jury Demand as follows:

## I.     NATURE OF THE ACTION

Plaintiff Kacee Snider alleges that Defendant Novae LLC d/b/a BrightStar Care (hereinafter "BrightStar") violated her rights under the Americans With Disabilities Act ("ADA") and the Colorado Anti-Discrimination Act ("CADA") in that BrightStar subjected Plaintiff to discrimination on the basis of her disability, because she requested an accommodation, and in retaliation for opposing discriminatory practices.

Plaintiff also alleges that Defendants BrightStar, Cassandra Mogel, and Jacob Yanes violated her rights under the Family and Medical Leave Act ("FMLA") in that Defendants interfered, restrained, or otherwise denied the exercise of, or attempted

exercise of, her FMLA rights, and retaliated against Plaintiff for having exercised or attempted to exercise her FMLA rights.

## II.     PARTIES, JURISDICTION, AND VENUE

1.      At all times relevant to this action, Plaintiff Kacee Snider was a resident of and domiciled in the State of Colorado.

2.      At all relevant times, Defendant Novae LLC, doing business as BrightStar Care Fort Collins/Loveland ("BrightStar"), is a Colorado limited liability company with a principal office address of 3880 N Grant Ave, Ste 180, Loveland, CO 80538.

3.      BrightStar employs more than 50 employees within a 75-mile radius of its main office.

4.      BrightStar is a covered employer under the ADA.

5.      BrightStar is a covered employer under the Colorado Anti-Discrimination Act.

6.      BrightStar is a covered employer under the FMLA.

7.      At all times relevant to this action, Defendant Cassandra Mogel owned and managed BrightStar.

8.      At all times relevant to this action, Defendant Jacob Yanes served as the Administrator of BrightStar.

9.      This Court has proper subject matter jurisdiction over this action under 28 U.S.C. § 1331 because, as is shown more fully in this Complaint, Plaintiff's ADA and FMLA claims arise under laws of the United States, namely 42 U.S.C. § 12111 *et seq.*, 42 U.S.C. § 1981a; and 29 U.S.C. § 2601, *et seq.*

10.     Jurisdiction over Plaintiff's pendant CADA claims is proper under 28 U.S.C. § 1367(a) because Plaintiff's claims arise from a common nucleus of operative fact.

11.     Venue is proper in this Court under either 28 U.S.C. § 1391(b)(1) or (2) as all Defendants reside in this district, and all the events or omissions giving rise to the claims herein occurred in this district.

### III.     ADMINISTRATIVE EXHAUSTION

12.     Ms. Snider dual-filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") and the U.S. Equal Employment Opportunity Commission ("EEOC") on January 24, 2019.

13.     The Charge of Discrimination included allegations of disability discrimination and retaliation.

14.     The CCRD issued Ms. Snider a Notice of Right to Sue on September 12, 2019.

15.     The EEOC issued Ms. Snider a Notice of Right to Sue on November 15, 2019.

16.     Ms. Snider has filed this action within 90 days of the date the CCRD and EEOC Notices of Right to Sue issued.

### IV.     FACTUAL ALLEGATIONS

17.     BrightStar is a home health agency that provides a range of in-home medical services to patients.

18.     BrightStar also provides medical staffing services to hospitals, nursing homes, and other healthcare providers.

19.     BrightStar employs nurses, CNAs, and fieldworkers on a full- or part-time basis to provide services to its clients.

20.     The services provided by BrightStar include personal, transitional, Alzheimer's and Dementia, and hospice care services.

21.     As part of its operations, BrightStar manages a constant and large influx of employee-caregivers to provide services to patients.

**Ms. Snider's Employment with BrightStar**

22.     Ms. Snider worked as an independent home care provider from approximately 2012 to May 2014.

23.     On May 7, 2014, Ms. Mogel hired Ms. Snider to be a Scheduler at BrightStar.

24.     In 2014, BrightStar promoted Ms. Snider to Branch Manager.

25.     As Branch Manager, Ms. Snider's responsibilities included the following duties:

    a.  interviewing and hiring/onboarding new employees;

    b.  performing drug screenings;

    c.  conducting orientations for new employees;

    d.  overseeing billing/invoicing, payroll, and day-to-day operations; and,

    e.  being available on-call.

26.     Ms. Snider's first term of employment with BrightStar ended on November 2, 2015.

27.     On November 2, 2015, Ms. Snider resigned her position at BrightStar to care for her mother, who had been diagnosed with terminal cancer.

28.     At the time she left her position at BrightStar in November 2015, Ms. Snider had been employed for nearly 18 months.

29.     On August 16, 2017, Ms. Mogel rehired Ms. Snider at BrightStar after she recruited Ms. Snider for the Recruiting and Retention Manager.

30.     The position of Recruiting and Retention Manager was a full-time position.

31.     When Ms. Snider returned to BrightStar in 2017, Jacob Yanes was Brightstar's Administrator, and Ms. Mogel was BrightStar's owner and manager.

32.     Mr. Yanes is Ms. Mogel's brother.

33.     At BrightStar, the Administrator position is second in command to the owner and manager.

34.     At Brightstar, the Administrator's duties include organizing the business and preparing the business for growth.

35.     During her second period of employment with Brightstar, Mr. Yanes was Ms. Snider's direct supervisor.

36.     As Ms. Snider's supervisor, Mr. Yanes had the following powers:

        a.  to direct her work;

        b.  make determinations regarding reasonable accommodations and medical leave; and,

        c.  to terminate her employment.

37.     Ms. Mogel had supervisory authority over Ms. Snider.

38.     As BrightStar's owner and manager, Ms. Mogel had authority over all BrightStar staff.

39.     As BrightStar's owner and manager, Ms. Mogel had the following powers over Ms. Snider's employment:

> a.  to direct Ms. Snider's work;
>
> b.  make determinations regarding reasonable accommodations and medical leave; and,
>
> c.  the power to terminate her employment.

40.     Between her employment in 2014 to 2015 and in 2017 to 2018, Ms. Snider had been employed with Brightstar for over 12 months by June 28, 2018.

41.     By June 28, 2018, Ms. Snider had been employed by BrightStar for over 1,250 hours of service during the preceding 12-month period.

42.     As of June 28, 2018, BrightStar had maintained over 50 employees on its payroll for each working day during each of 20 or more calendar workweeks in 2018 or 2017.

### Ms. Snider Unexpectedly Developed a Serious Medical Condition and Took Medical Leave from BrightStar

43.     From August 16, 2017 to June 25, 2018, Ms. Snider worked at BrightStar without receiving any discipline or poor evaluations.

44.     In the days leading up to June 25, 2018, Ms. Snider began to experience headaches that progressively worsened, interfering with her focus, vision, comprehension, and speech.

45.     On June 25, 2018, after experiencing a particularly severe headache, Ms. Snider left work to seek emergency medical care and received a CT scan.

46.     Following her CT scan, Ms. Snider was diagnosed with Chiari Malformation with Syringomyelia, a structural defect in the base of the skull and cerebellum.

47.    Ms. Snider's condition inhibited her cognition and neurological functioning, ability to work, as well as major life activities such as driving.

48.    Ms. Snider suffered from symptoms including but not limited to severe headaches, inability to focus or concentrate, difficulty speaking, difficulty hearing, and impaired vision.

49.    Ms. Snider was advised to make a follow-up appointment with her primary care physician as soon as possible.

50.    She called the following day, June 26, 2018 and requested the next available appointment, which was June 28, 2018.

51.    Ms. Snider returned to work on June 25, 2018, the day of her emergency room visit, and informed Ms. Mogel of her emergency room visit.

52.    Ms. Snider returned to work each day following, up to June 28, 2018.

53.    On June 28, 2018, Dr. Sheppard-Madden, Ms. Snider's primary physician, confirmed her Chiari Malformation diagnosis and referred Ms. Snider to consult with a neurosurgeon.

54.    On June 28, 2018, Dr. Sheppard-Madden instructed Ms. Snider to refrain from driving and working until she could be seen by a neurosurgeon.

55.    Immediately after her June 28, 2018 appointment, Ms. Snider called Mr. Yanes to update BrightStar on her medical condition, including the severity of her condition and her need for medical leave.

56.    During that conversation on June 28, 2018, Mr. Yanes told Ms. Snider to take care of herself.

57.     During that conversation on June 28, 2018, Mr. Yanes told Ms. Snider to do what she needed to do.

58.     During that conversation on June 28, 2018, Mr. Yanes told Ms. Snider to keep him updated on any new appointments or developments.

59.     After her call with Mr. Yanes ended, Ms. Snider also updated Ms. Mogel about her condition by text message.

60.     By response text message, Ms. Mogel instructed Ms. Snider to "do what you need to take care of yourself."

61.     As of June 28, 2018, Ms. Snider began medical leave from BrightStar.

62.     While she was out on leave, Ms. Snider continued to update BrightStar of any new developments concerning her medical condition:

> a.  On July 3, 2018 Ms. Snider informed BrightStar that on July 10, 2018 she would undergo an MRI.
>
> b.  On July 12, 2018, Ms. Snider updated BrightStar that on July 17, 2019 she had an upcoming neurology appointment.

63.     On July 17, 2018, Ms. Snider was seen by neurosurgeon Dr. Beth Gibbons.

64.     Dr. Gibbons informed Ms. Snider that the only treatment for her Chiari Malformation diagnosis was a craniotomy, a type of brain surgery.

65.     Dr. Gibbons informed Ms. Snider that she could expect to return to work between two to four weeks after the surgery.

66.     Dr. Gibbons also referred Ms. Snider for additional MRI and CT scans, which were required prior to her surgery.

67.     On July 17, 2018, following her appointment with Dr. Gibbons, Ms. Snider updated Ms. Mogel and Mr. Yanes by text message with her updated treatment plan, including a tentative schedule for surgery "in the next three weeks."

68.     Ms. Snider at all times attempted to obtain medical treatment as quickly as possible, however the scheduling of her craniotomy and other necessary appointments required her to fulfil certain preconditions set by her health insurance, as well as work around her medical providers' schedules.

69.     On July 18, 2018, Ms. Snider provided Mr. Yanes and Ms. Mogel additional updates by text message regarding her upcoming CT and MRI scans and neurology appointments.

70.     On July 18, 2018, Ms. Mogel replied by text message that she would schedule a meeting for the following week to touch base and make a plan regarding Ms. Snider's medical leave.

71.     On July 18, 2018, Ms. Snider informed Mr. Yanes by text message that she would not be able to return to work until her surgery was completed.

72.     On July 18, 2018, Mr. Yanes confirmed by text message that he was aware and understood that Ms. Snider was unable to return to work until after she underwent a craniotomy.

**Ms. Snider  Requested FMLA Leave from BrightStar**

73.     By the end of July 2018, despite the numerous reassurances from both Ms. Mogel and Mr. Yanes, Mr. Yanes began asking Ms. Snider for her "blessing" to permanently replace her and fill her position with someone else.

74.    On July 26, 2018, Ms. Snider told Ms. Mogel by text message that she had undergone the required medical imaging and would be meeting with her surgeon to finalize the scheduling of her craniotomy.

75.    Ms. Snider spoke with Mr. Yanes and informed him that:

  a.  the date of her surgery had not yet been scheduled, but that it would likely occur in August; and,

  b.  that she would be able to return to work by early September, approximately two to four weeks following the surgery.

76.    Ms. Snider spoke with Mr. Yanes and informed him that she intended to continue working for BrightStar as soon as she was able to return from her surgery.

77.    Ms. Snider told Mr. Yanes that, because the one-year anniversary of her re-hiring at BrightStar was approaching, she would soon be eligible for FMLA leave.

78.    The one-year anniversary of Ms. Snider's re-hiring at Brightstar was August 16, 2018.

79.    Ms. Snider notified Mr. Yanes that she wanted to exercise her FMLA rights and take FMLA leave as soon as she was eligible.

80.    Mr. Yanes responded that he would research her FMLA eligibility.

81.    However, neither he nor anyone else at BrightStar ever responded to Ms. Snider about her eligibility or request for FMLA leave.

**BrightStar Unlawfully Terminated Ms. Snider**

82.    On July 30, 2018, Mr. Yanes left Ms. Snider a voicemail message stating that BrightStar could no longer hold Ms. Snider's position open while she was on leave.

83.     In his message to Ms. Snider, Mr. Yanes stated that BrightStar could not be sure that Ms. Snider's anticipated September return date would be accurate.

84.     In his message to Ms. Snider, Mr. Yanes also stated that if he waited any longer to terminate Ms. Snider's employment, there would be "FMLA issues."

85.     BrightStar believed that Ms. Snider would soon be eligible for FMLA leave and sought to terminate her beforehand to avoid having to provide Ms. Snider with FMLA leave and reinstatement.

86.     On August 1, 2018, at their request, Ms. Snider met Ms. Mogel and Mr. Yanes at the BrightStar office.

87.     Because Ms. Snider was unable to drive, her husband, David Snider, drove her to the meeting and attended it with her.

88.     As the meeting began, Ms. Mogel slid a termination letter across the desk to Ms. Snider.

89.     Ms. Mogel stated that she could not leave Ms. Snider's position open and that BrightStar was terminating her employment effective immediately.

90.     Ms. Mogel stated that Ms. Snider would have an "open invitation" to return to BrightStar after she had recovered.

91.     But when Ms. Snider asked Ms. Mogel whether she would be reinstated in an equivalent position, with the same pay and hours, Ms. Mogel did not respond.

92.     The termination letter was dated July 30, 2018.

93.     The termination letter stated that BrightStar had terminated Ms. Snider as "a direct result of position duties unable to be fulfilled."

94.     The termination letter stated that the termination was on "excellent terms" and that BrightStar would provide Ms. Snider with "excellent references."

### Ms. Snider's Medical Care Progressed as Anticipated

95.     On August 22, 2018, Ms. Snider successfully underwent a craniotomy.

96.     On September 4, 2018, Dr. Beth Gibbons approved Ms. Snider to return to work.

97.     As of September 4, 2018, Ms. Snider was able to return to work and fulfill her job duties at BrightStar.

98.     But for Defendants' unlawful actions, Ms. Snider would have returned to work at BrightStar on September 4, 2018.

### V.      STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Disparate Treatment in Violation of the Americans With Disabilities Act and the Colorado Anti-Discrimination Act**
**42 U.S.C. § 12112; C.R.S. § 24-34-402(1)(a)**
**(Against Defendant BrightStar)**

99.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

100.    Ms. Snider's Chiari Malformation was a qualifying disability under the ADA and the Colorado Anti-Discrimination Act.

101.    Ms. Snider was qualified, and successfully performed, the essential functions of her job at Brightstar.

102.    At no time prior to her medical leave did BrightStar suggest that Ms. Snider was not qualified or was otherwise unable to perform the essential functions of her job.

103.    After, Ms. Snider's first tenure at Brightstar, Ms. Mogel recruited Ms. Snider to return to work at BrightStar.

104.    Ms. Snider had no disciplinary history at BrightStar and had not received any negative performance evaluations.

105.    Ms. Snider was authorized to return to work once she underwent surgery to correct her Chiari Malformation.

106.    Ms. Snider requested medical leave for the period of June 28, 2018 through her recovery from surgery to accommodate her medical condition.

107.    BrightStar discriminated against Ms. Snider based on disability, perceived disability and record of impairment, by terminating her employment.

108.    BrightStar stated in its termination letter to Ms. Snider that she was terminated as "a direct result of position duties unable to be fulfilled" while she was on medical leave.

109.    Ms. Snider's disability was a motivating factor in BrightStar's decision to terminate her employment.

110.    Brightstar's conduct described herein violated the antidiscrimination laws of the United States and the State of Colorado and constitutes prohibited discriminatory practices thereunder.

111.    Brightstar's conduct described herein was done with malice or reckless disregard of Ms. Snider's protected rights under state and federal law.

112.    As a direct result of BrightStar's actions, Ms. Snider has suffered significant injuries, damages, and losses to be determined at trial.

## SECOND CLAIM FOR RELIEF
### Failure to Accommodate in Violation of the Americans With Disabilities Act and the Colorado Anti-Discrimination Act
### 42 U.S.C. § 12203; C.R.S. § 24-34-402(1)(e)
### (Against Defendant BrightStar)

113.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

114.    Ms. Snider was qualified, and successfully performed, the essential functions of her job at Brightstar.

115.    Ms. Snider's Chiari Malformation was a qualifying disability under the ADA.

116.    Ms. Snider informed BrightStar of her condition and requested an accommodation.

117.    In the Tenth Circuit, "it is well settled" that unpaid medical leave allowing "sufficient time to recover from an injury or illness" can be a reasonable accommodation if it allows the employee to perform the essential functions of the job "in the near future." *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds by Bd. of Trs. Of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001).

118.    Ms. Snider could have continued to perform the essential functions of her job if she had been provided with sufficient medical leave to complete her surgery.

119.    Providing medical leave to Ms. Snider from June 28, 2018 through her recovery from surgery on September 4, 2018 was not unreasonable and did not pose an undue burden on BrightStar.

120.    BrightStar discriminated against Ms. Snider by failing to accommodate her request for medical leave, by its desire to avoid accommodation, and by unreasonably failing to provide any other accommodation.

121.    By failing to accommodate Ms. Snider, Brightstar altered the terms and conditions of her employment.

122.    As a result of BrightStar's failure to accommodate Ms. Snider, BrightStar terminated Ms. Snider's employment.

123.    Brightstar's conduct described herein violated the antidiscrimination laws of the United States and the State of Colorado and constitutes prohibited discriminatory practices thereunder.

124.    Brightstar's conduct described herein was done with malice or reckless disregard of Ms. Snider's protected rights under state and federal law.

125.    As a direct result of BrightStar's actions, Ms. Snider has suffered significant injuries, damages, and losses to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Retaliation in Violation of the Americans With Disabilities Act and the Colorado Anti-Discrimination Act**
**42 U.S.C. § 12203; C.R.S. § 24-34-402(1)(e)**
**(Against Defendant BrightStar)**

126.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

127.    The ADA prohibits retaliation. 42 U.S.C. § 12203(a).

128.    The Colorado Anti-Discrimination Act, C.R.S. § 24-34-402, makes it unlawful to attempt to commit any act defined as unlawful by the Act and to discriminate against any such person because that person opposed unlawful practices or engaged in other protected activities.

129.    To prove retaliation, the plaintiff must show that: (1) she engaged in protected activity, (2) a reasonable employee would have found the challenged action

materially adverse, and (3) there is a causal connection between the protected activity and the material adverse action.

130. Ms. Snider engaged in protected activity including but not limited to requesting accommodation for her disability.

131. BrightStar terminated Ms. Snider approximately one month after her medical diagnosis and less than one week after her last request for accommodation.

132. Brightstar terminated Ms. Snider as "a direct result of position duties unable to be fulfilled" while she was on medical leave.

133. As a result of Ms. Snider's protected activity, BrightStar terminated Ms. Snider's employment.

134. Brightstar's conduct described herein violated the antidiscrimination laws of the United States and the State of Colorado and constitutes prohibited discriminatory practices thereunder.

135. Brightstar's conduct described herein was done with malice or reckless disregard of Ms. Snider's protected rights under state and federal law.

136. As a direct result of BrightStar's actions, Ms. Snider has suffered significant injuries, damages, and losses to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**Interference in Violation of the Family and Medical Leave Act**
**29 U.S.C. § 2615(a)**
**(Against All Defendants)**

137. Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

138. At the time of her request for medical leave, Ms. Snider was an eligible employee under the Family and Medical Leave Act.

139.   At the time of her request for medical leave, Ms. Snider had been employed by BrightStar for over one year—from May 2014 to November 2017 and again from August 2017 to June 2018—and had been employed by BrightStar for at least 1,250 hours during the preceding 12 months. *See* 29 U.S.C. § 2611(2)(A).

140.   At the time of Ms. Snider's request for medical leave, BrightStar was a covered employer under the Family and Medical Leave Act.

141.    At the time of Ms. Snider's request for medical leave, BrightStar had employed fifty or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year. *See* 29 U.S.C. § 2611(2)(B)(ii).

142.   At all times relevant to this action, Defendant Cassandra Mogel acted, directly or indirectly, in the interest of BrightStar to the employees of BrightStar and is therefore a covered employer under the Family and Medical Leave Act. *See* 29 U.S.C. § 2611(4)(A)(ii)(I).

143.   At all times relevant to this action, Defendant Jacob Yanes acted, directly or indirectly, in the interest of BrightStar to the employees of  BrightStar and is therefore a covered employer under the Family and Medical Leave Act. *See* 29 U.S.C. § 2611(4)(A)(ii)(I).

144.   Defendant Cassandra Mogel controlled Ms. Snider's ability to take a leave of absence and controlled the terms of her employment.

145.   Defendant Jacob Yanes controlled Ms. Snider's ability to take a leave of absence and controlled the terms of her employment.

146. Ms. Snider was entitled to take up to 12 weeks of FMLA leave because her Chiari Malformation was a serious medical condition that interfered with her cognition and neurological functioning and made her unable to drive, work or perform her job duties.

147. Ms. Snider was entitled to take up to 12 weeks of FMLA because her Chiari Malformation diagnosis involved inpatient care and required continuing treatment such as surgery. *See* 29 C.F.R. §§ 825.113(a), 825.115(e)(1).

148. On June 28, 2018, upon the onset of her medical condition, Ms. Snider gave appropriate notice to Defendants of her need to be absent from work.

149. Defendants were reasonably apprised of Ms. Snider's request to take time off work for a serious medical condition.

150. Under the FMLA, it is unlawful for an employer to interfere with an employee exercising or attempting to exercise any right provided under the Act. *See* 29 U.S.C. § 2615(a)(1).

151. Defendants interfered with Ms. Snider's rights under the FMLA by failing to notify Ms. Snider of her eligibility for FMLA leave.

152. Defendants interfered with Ms. Snider's rights under the FMLA by terminating Ms. Snider's employment.

153. Defendants interfered with Ms. Snider's rights under the FMLA by discouraging Ms. Snider from taking leave.

154. Defendants interfered with Ms. Snider's rights under the FMLA by denying Ms. Snider permission to take leave.

155. Defendants interfered with Ms. Snider's rights under the FMLA by preventing Ms. Snider from taking the full 12 weeks of leave guaranteed by the FMLA.

156.    Defendants interfered with Ms. Snider's rights under the FMLA by refusing to allow her to return to her job, or to an equivalent position, upon return from leave.

157.    Defendants' actions were related to Ms. Snider's exercise or attempted exercise of her FMLA rights.

158.    Defendants' actions were intentional, willful, and/or done with reckless disregard to Ms. Snider's rights under federal law.

159.    As a direct result Defendants' actions, Ms. Snider has suffered significant injuries, damages, and losses to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### Retaliation in Violation of the Family and Medical Leave Act
### 29 U.S.C. § 2615(a); 29 C.F.R. § 825.220
### (Against All Defendants)

160.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

161.    The FMLA prohibits an employer from discriminating or retaliating against an employee for having exercised or attempting to exercise FMLA rights. See 29 C.F.R. § 825.220(c); 29 U.S.C. § 2615.

162.    To prove retaliation, a plaintiff must prove that: (1) she engaged in a protected activity; (2) the employer took an action that a reasonable employee would have found materially adverse; (3) there is a causal connection between the protected activity and the adverse action.

163.    Ms. Snider engaged in protected activity under the FMLA including but not limited to notifying Defendants of her serious medical condition; notifying Defendants of her need for time off work; notifying Defendants of her intent to take FMLA leave; and notifying Defendants of her intent to seek reinstatement following leave.

164. A reasonable employee would find BrightStar's termination of Ms. Snider to be materially adverse.

165. As a result of Ms. Snider's protected activity, BrightStar terminated Ms. Snider's employment.

166. Defendants' actions were intentional, willful, and/or done with reckless disregard to Ms. Snider's rights under federal law.

167. As a direct result of Defendants' actions, Ms. Snider has suffered significant injuries, damages, and losses to be determined at trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kacee Snider respectfully requests that the Court enter judgment for the following relief:

a. All declaratory relief and injunctive relief, as appropriate;

b. Actual economic damages as established at trial;

c. Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d. Liquidated damages pursuant to 29 U.S.C. §2617(a)(1)(A)(iii);

e. Punitive damages for all claims as permitted by 42 U.S.C. § 1981a;

f. Punitive damages for all claims as permitted by C.R.S. § 23-34-405;

g. Pre-judgment and post-judgment interest at the highest lawful rate;

h. Appropriate tax-offset, as allowed by law;

i. Attorneys' fees and costs, as allowed by law;

j.  Any other appropriate remedy available under law; and

k.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 6th day of December 2019.

RATHOD | MOHAMEDBHAI LLC

s/ Felipe Bohnet-Gomez
Felipe Bohnet-Gomez
2701 Lawrence Street, Suite 100
Denver, CO 80205
(303) 578-4400
fbg@rmlawyers.com

ATTORNEYS FOR PLAINTIFF